UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: _____

JURY TRIAL DEMANDED

CHRISTOPHER T. BERES

                      Plaintiff,

vs.

NATIONAL LAW FORUM LLC,

                      Defendant.

_____/

## COMPLAINT

Plaintiff, CHRISTOPHER T. BERES, by his counsel TINO GONZALEZ, ESQ., sues

NATIONAL LAW FORUM LLC and states as follows.

## JURISDICTION AND VENUE

1.      Jurisdiction for this cause of action lies within this court by virtue of 28 USC 1332.

This is an action for defamation and the parties are diverse in citizenship.

2.      Plaintiff, CHRISTOPHER T. BERES ("Beres"), is a citizen and resident of the

State of Florida.

3.      Defendant NATIONAL LAW FORUM LLC (hereinafter "NLF") is a limited

liability company based and operating in the State of Illinois and is therefore diverse in citizenship

1

to Beres by virtue of 28 USC 1332(c)(1).  It is the publisher of The National Law Review ("NLR").

4.      The amount of damages sought in this cause of action is $20,000,000 in compensatory damages and $100,000,000 in punitive damages, thus meeting the subject matter jurisdiction requirements of 28 USC 1332 (a) because the matter in controversy exceeds the sum or value of $75,000.

5.      Venue is proper in the Southern District of Florida for the following reasons:

a)      The tort which is the basis of this lawsuit was committed in South Florida in addition to all over the world.  South Florida has a population of approximately 10 million people, thus making the alleged defamatory statements in this venue significant.

b)      Beres is a citizen of the State of Florida and currently resides in South Florida.

c)      Venue is further proper because defendant has and/or continues to regularly conduct business in Florida.   Florida is one of NLR's "jurisdictions":  "The National Law Review covers an extensive range of cases coming out of Florida. Florida is part of the Eleventh Circuit.  Florida is known for catastrophic hurricanes and (sic) a hotbed for immigration (sic) these issues are analyzed by the legal experts at NLR.   Further, administrative agency news, bankruptcy proceedings, insurance (stemming from flood/hurricane damage) and medical marijuana are several areas of interest (sic) are followed and covered by The National Law Review."

https://www.natlawreview.com/jurisdiction/all-states/florida

d)      NLF does business in South Florida, which is where this Court is based.

6.      Defendant is liable to personal jurisdiction under Florida's long-arm statute Fla. Stat. § 48.193 (2017) because it defamed Beres in the State of Florida.  Several persons in the State of Florida, including members of the Florida Bar, accessed the article in NLR in the State of Florida.   Exhibit A.   The material was accessed-thus-published in Florida.   Defendant has transacted business and engaged in tortious conduct, by affirmative act or omission, in the State of Florida such that it reasonably anticipated being subject to personal jurisdiction before the courts of this State.  Defendant has also transacted business and engaged in tortious conduct, by affirmative act or omission, outside of the State of Florida whereby it reasonably anticipated that injury would result and has, in fact, resulted upon persons within the State of Florida.  As such, this Court has personal jurisdiction over defendant pursuant to Fla. Stat. §§ 48.193(1)(a)(2) and 48.193(1)(a)(6).

7.      This Court has jurisdiction pursuant to the provisions of Chapter 501, Part II, Florida Statutes. The acts or practices alleged herein occurred in the conduct of "trade or commerce" as defined in Section 501.203(8), Florida Statutes.

8.      The statutory violations alleged herein occur in or affect more than one judicial district in the State of Florida, including the Southern District of Florida.

<u>COUNT ONE</u> –
DEFAMATION (SLANDER AND LIBEL)

9.      This is an action for damages arising from NLR's publication of an article containing false, injurious, and defamatory statements about plaintiff.

10.     Beres is a member in good standing of the Florida Bar for almost 20 years.   He graduated from Capital University Law School in 1992 and also received his master's degree in East Asian Studies from the University of Pennsylvania.   He is a professional of high repute.

11.     Prior to the filing of this lawsuit, Dennis Fairbanks, Esq., Barbara Jimmis, Maria Morton, Devale Rivers, Jr., Kaori Suzuki Fischer, and Anthony Trombetta, all Florida citizens and residents, accessed the article in the State of Florida, opened it online, and read it.  Mr. Fairbanks is a member of the Florida Bar.  They said that the article defamed Beres.

12.     On April 15, 2020, Beres filed an employment lawsuit in Florida on behalf of a John Doe plaintiff in the State of Florida against Toyota Motor Corporation ("TMC"), Toyota Motor North America, Inc. ("TNMA"), and Akio Todoya (collectively, "Toyota").  *John Doe v. Toyota Motor Corp. et al.*, No. 05-2020-CA-024281 (Fla. 18th Cir. Ct. April 15, 2020).   On April 22, 2020, Toyota retaliated against the John Doe by having its agent HC2, Inc., a job agency ("HC2"), file a lawsuit with two claims for 1) breach of contract and 2) faithless servant against the John Doe in the United States District Court for the Southern District of New York (the "Southern District") and seeking a temporary restraining order ("TRO") and a permanent injunction ("PI"). *HC2, Inc. v. Delaney*, 1:20-cv-03178 (S.D.N.Y. filed April 22, 2020).

13.     On April 22, 2020, the Honorable Lewis J. Liman *denied* HC2's ex parte TRO motion.  On May 27, 2020, Judge Liman also *denied* HC2's application for a PI.

14.     In rejecting the PI, Judge Liman issued an order about "Delaney's lawyer" (Beres) and ruled that Beres's April 7, 2020 employment demand letter to Akio Toyoda, Chairman of

Toyota Motor Corporation, was "a routine demand letter" and "it's not an extortion". The federal

judge held that Beres was merely exercising his and his client's rights under the law:

> "Delaney's lawyer makes the allegation that plaintiff violated Delaney's rights and then
> states 'I hereby grant you seven days from the date of this letter to contact me with your
> offer to settle this case. If you fail to contact me by this date, I will commence legal action
> against you without further notice.' The evidence is that letter was only given to the
> plaintiff in this case shortly before the state court complaint was filed and not with the full
> seven days. <u>Even then it is a routine demand letter and it's not an extortion</u>. *See U.S. v.
> Jackson*, 180 F.3d 55, 61, that a claim of right is not an extortion."

(emphasis added)   Judge Liman further held that the information in the case was of no value to

anyone:

> "Number two, there has been no showing that any information Delaney has is of any
> commercial value to any third party or that there would be any benefit to Delaney from
> disclosing that information. The only value that the information apparently has -- at least in
> Delaney's mind -- is as evidence in support of his claim against HC2."

Therefore, it would not be possible to "blackmail" or "extort" someone with information that had

no value.

15.     Judge Liman read the Southern District order out loud in open court at a public

hearing at which reporters attended and were invited to attend.

16.     On or around May 11, 2020, defendant published an article presenting Beres as

having engaged in "nefarious negotiations" in violation of the federal blackmail and extortion

statutes.   These are serious crimes.   Beres was the "nefarious negotiator".   The headline reads:

"Federal Blackmail & Extortion Statutes: Nefarious Negotiations."     In addition to the quoted

headline, the NLR article includes the following content:

> Legal issues involving blackmail and extortion are on the rise.  From the recent conviction
> of Michael Avenatti for a scheme to extort Nike for a $25 million "settlement,"[1] to
> disgruntled former employees threatening to release confidential information,[2] to
> anonymous ransomware attacks demanding payment in cryptocurrency due to the
> Coronavirus Pandemic,[3] to public officials' alleged efforts to pressure companies to

employ union workers in order to secure permits, the terms "blackmail" and "extortion" are increasingly prevalent in boardrooms, courtrooms, and elsewhere.[4]

NLR associated and equated Beres and Beres's client with Michael Avenatti ("Avenatti"), a lawyer who was criminally prosecuted and convicted of extortion. His name immediately precedes the reference to Beres and his client, and is in footnote [1]. Footnote [2] references an article about Beres and his client with a hyperlink. That article refers to Beres's client's hiring an "employment attorney" - that is Beres - to issue a demand letter and to negotiate with his client's former employer, and to the case Beres filed for him in the courts of Florida. But Beres's case involves *civil* claims. Moreover, contrary to NLR's libel, neither Beres nor his client "threatened to release confidential information."

17.    Including Beres in an article about "Federal Blackmail & Extortion Statutes" is defamatory because he was never accused of violating federal blackmail and extortion statutes. Beres's cases are *civil* litigation. In New York, *there is no civil extortion*. The second sentence of the article quoted above lists four cases/examples of blackmail and extortion. NLR put Beres in the same boat as Avenatti, a convicted felon, and after them as ransomware attackers (referred to in the hyperlink as "criminals")  and as officials indicted in Massachusetts for Hobbs Act extortion and conspiracy to commit Hobbs Act extortion. *United States v. Brissette*, 919 F.3d 670 (1st Cir. 2019). Thus, apart from Beres, the three other examples of "federal blackmail and extortion" involved *criminal* cases.

18.     There were no negotiations between Beres and Toyota.  The only attempt at negotiation was a routine demand letter which Beres sent to Toyota on April 7, 2020.  Therefore, the only negotiation that NLR could possibly be referring to is the Beres letter.  There was nothing else.

19.     Moreover, on its face and per Judge Liman's ruling, the Beres letter did not a) threaten to disclose privileged and confidential information nor did it b) demand payment of money.  In fact, there is no dollar amount demanded at all in the letter.  NLR's libel that plaintiff was engaged in blackmail and extortion is not possible in the context that Beres did not make any threat and he also did not demand payment of money.  A predicate of extortion is a threat and a demand for money.  Neither is present in the Beres letter.  The only way that NLR could claim that there was extortion was by falsifying the contents of the letter.  This is what NLR did.

20.     The clear implication - and the premise of the article - is that Beres engaged in "nefarious negotiations" by threatening to reveal confidential information on behalf of a so-called "disgruntled employee" (this is also false;  Beres's client was no longer an "employee" at the time Beres was negotiating on his behalf).

21.     The Beres letter states that Toyota "had Mr. Delaney illegally fired for raising concerns about unlawful and unsafe conditions in your workplace."  Beres further complained that: "Prior to this date, you illegally disclosed Mr. Delaney's identity, involvement, and work-product to the other side."  Beres then stated:  "I hereby grant you 7 days from the date of this letter to contact me with your offer to settle this case."  See Exhibit B.

22.     The Beres demand letter to Toyota which NLR claims was blackmail and extortion attached herewith as Exhibit B is on its face not blackmail or extortion and was already ruled by a federal court to be "a routine demand letter and it's not an extortion."  Notwithstanding that that occurred 20 months ago, NLR has never removed and retracted this false and defamatory material which is available for the whole world to read.

23.     The NLR article also suggests Beres may have violated the Rules of Professional Conduct:  "This unique environment highlighted by the widespread use of federal monies by private companies and mass layoffs, coupled with the rising volume of information that companies maintain, may result in an increase in blackmail and extortion. *For attorneys, threatening criminal action in the context of civil litigation could violate the Model Rules of Professional Conduct and can lead to disciplinary action.*[50]" (emphasis added)

24.     In contrast to Beres, in New York, the Avenatti indictment accused Avenatti of extorting a payment from Nike of $25 million in exchange for not holding a press conference to reveal embarrassing non-public information about the company.  There was a threat in the Avenatti case.  However, the threat must also be made with the specific intention of forcing someone else to provide money, property, or something of value.  In Beres's case, there was neither a threat nor a demand for money.

25.     Oxford Dictionary defines "nefarious" as an adjective meaning "wicked or criminal" and gives the example:  "the nefarious activities of the organized-crime syndicates."

Merriam-Webster Dictionary explains that "nefarious" derives from the Latin noun "nefas",

meaning "crime".

26.     May 11, 2020, the date this article was published, was only 19 days after Beres's

client's former employer, Toyota's agent, filed the Southern District complaint against him.   An

answer was not filed until May 13, 2020, two days after it was published.   NLR never contacted

Beres or his client for his side of the story.[1]

27.     NLR also misleadingly did not cite the date of the case against Beres's client or

state that it had just been filed.

28.     NLF cannot claim that this is a fair report.   It plainly is not.   At the time the article

was written, the only documents in the public domain were the complaint and the routine Beres

employment demand letter.   The complaint contains two causes of action for 1) breach of contract

and 2) faithless servant.   The word "blackmail" does not appear in the complaint or any other

documents.   The only person who accused Beres and his client of blackmail - and associated him

with a notorious convicted felon (Avenatti) and criminal defendants - is NLR.   Exhibit B speaks

for itself.

---

[1] As a side point, these practices by NLR go against journalistic ethics.   In contrast, the Ethics Policy of The Washington Post states inter alia:

> No story is fair if it consciously or unconsciously misleads or even deceives the reader.   Fairness includes honesty - leveling with the reader.
>
> No story is fair if it covers individuals or organizations that have not been given the opportunity to address assertions or claims about them made by others.   Fairness includes diligently seeking comment and taking that comment genuinely into account.

https://www.washingtonpost.com/policies-and-standards/

29.     On March 18, 2021, in a filing with the United States Securities and Exchange Commission (the "SEC"), Toyota - Beres's client's former employer - informed the SEC about its violations of the Foreign Corrupt Practices Act and that it has been cooperating with the SEC's and the United States Department of Justice's investigations.  Toyota's SEC disclosure stated:  "The investigations could result in the imposition of civil or criminal penalties, fines or other sanctions, or litigation by the DOJ or the SEC.  Toyota cannot predict the scope, duration or outcome of the matter at this time."

30.     Two months later, on May 26, 2021, it was reported that Beres's client's former *employer* Toyota - *not Beres or his client* - was under a DOJ grand jury investigation in Texas.  Exhibit C.  But NLR tried to present the false and libelous picture that Toyota was the innocent victim of Beres's and his client's supposed criminality.

31.     Defendant defamed Beres to scare companies to sell subscriptions and gain readership during the coronavirus climate of fear.  NLF also promoted the sale of the lucrative services of its contributors and advertisers, the Ashcroft Law Firm of former United States Attorney-General John Ashcroft and Quarles & Brady LLP, at Beres's expense by accusing him and his client of crimes.  Right after the Southern District case was filed, they saw a "golden opportunity" to make money at the expense of Beres and his professional reputation by inferring that he is a crook and certainly did not want to give him the opportunity to correct or challenge their libel.

32.     Such conduct is in direct violation of law and outside First Amendment protection. The false narrative about Beres spread like a disease including on social media.

33.     The article is linked on NLR's Facebook page *with a picture of a person in handcuffs.* Exhibit D.  As the expression goes, a picture is worth a thousand words.

https://www.facebook.com/235781268996/posts/federal-blackmail-extortion-statutes-nefarious-neg otiations-authored-by-luke-cas/10157306917073997/

34.     It also appears on LinkedIn to promote the sale of legal services of "Luke Cass" "white collar crime attorney".

https://www.linkedin.com/in/lukecass-whitecollarcrimeattorney

35.     The damage to Beres's reputation does not have to be imagined.  The defamation in this case directly affects Beres's profession as a lawyer and is therefore defamation per se.  His law practice has been irreparably damaged and he has been the subject of ridicule.  No client would ever hire a lawyer who is accused of felonies and who it was worried would blackmail it.

36.     The defamatory statements were made by NLF at least negligently and without regard for the truth because it knew or should have known its statements to be false.

37.     As a direct and proximate result of defendant's defamatory actions, Beres has suffered and continues to suffer damage, including, but not limited to, damage to his reputation, embarrassment, pain, humiliation, mental anguish, and he has sustained past and future loss of earnings.

38.     At the time the false and damaging statements were published, defendant knew or should have known them to be false.  Defendant made its statements at least negligently, and nonetheless, made and/or published the statements with an intent to indulge ill will, hostility, and an intent to harm, thus giving rise to the right to recover punitive damages in order to deter defendant from engaging in this conduct in the future and hopefully restore integrity to both defendant and the media as a whole.

WHEREFORE, plaintiff demands:

a)     Judgment against defendant in the amount of Twenty Million Dollars ($20,000,000) as compensatory damages.

b)     One Hundred Million Dollars ($100,000,000) as punitive damages.

c)     All taxable litigation costs, pre-judgment interest, and post-judgment interest.

d)     A trial by jury.

Dated:   January 25, 2022                    /s/Tino Gonzalez_____
                                             Tino Gonzalez, Esq.
                                             *Attorney for Plaintiff*
                                             Florida Bar No.:  378089
                                             1600 Sarno Road Ste. 1
                                             Melbourne, FL 32935
                                             (321) 751-9675
                                             tino@tinolegal.com

## CERTIFICATE OF COMPLIANCE

I HEREBY CERTIFY that plaintiff has complied with the pre-suit notice requirement of

Fla. Stat. § 770.01.


Dated: January 25, 2022                              /s/Tino Gonzalez
                                                     Tino Gonzalez, Esq.

Exhibit A

Published on *The National Law Review* (http://www.natlawreview.com)

# Federal Blackmail & Extortion Statutes: Nefarious Negotiations

Article By:

Luke Cass

Simon Cataldo



Legal issues involving blackmail and extortion are on the rise.  From the recent conviction of Michael Avenatti for a scheme to extort Nike for a $25 million "settlement,"[1] to disgruntled former employees threatening to release confidential information,[2] to anonymous ransomware attacks demanding payment in cryptocurrency due to the Coronavirus Pandemic,[3] to public officials' alleged efforts to pressure companies to employ union workers in order to secure permits, the terms "blackmail" and "extortion" are increasingly prevalent in boardrooms, courtrooms, and elsewhere.[4]

These cases raise the question — when do hardball tactics run afoul of federal criminal law? This article examines this type of conduct in the context of five federal statutes, the scope of conduct covered by them, and the circumstances in which they are being charged.

## I.    Blackmail

The term "blackmail" is often used interchangeably to describe myriad offense conduct, including intimidation, coercion, theft, or stealing. But while blackmail may be used colloquially to describe these general categories of coercive conduct, at the federal level it's specific and limited to circumstances involving the payment of hush money — "pay me this sum and I will not report or testify about this federal offense."[5]

Blackmail is a singularly unique criminal offense. It is one of the only statutes that makes the combination of two independently legal acts criminal.[6] The federal blackmail statute, 18 U.S.C. § 873,[7] requires the government to prove: (1) the defendant demanded money or other things of value from the victim; (2) under the threat of informing or consideration for not informing against a violation of any law of the United States; and (3) the defendant had knowledge relating to illegal activity and offered to withhold the information.[8] Section 873 "reaches those who would evade their responsibility to inform the authorities about a violation of the law by exchanging the promise to forebear from giving such information for some benefit."[9] It is irrelevant whether the defendant had a claim of right to the benefits, rather, it is "the use of the information in this manner" that "Congress sought to penalize."[10] An important limitation to § 873 is that the statute, by its terms, reaches only threats involving the disclosure or non-disclosure of violations of federal law.[11]  Therefore, threats to reveal lurid or embarrassing, but non-criminal, conduct—such as an extramarital affair—will not, standing alone, amount to a violation of § 873.

The case of *United States v. Kuruzovich*[12] is a good example of a typical blackmail scheme. Kuruzovich worked for a company until he was fired for performance issues and unprofessional conduct.[13] Immediately prior to, and shortly after his termination, Kuruzovich began emailing demands for payment of benefits, commissions, severance, and other monies from the company and threatened that, if his demands were not met, he would report allegations of insider trading and other illicit activity by the company to various government authorities.[14] He further reported such allegations to two company clients, one of which did not renew its service subscription.[15]

Kuruzovich also took proprietary information from the company's confidential database and was subsequently charged with violating § 873.[16]

Federal blackmail is a demand for consideration in exchange for silence about federal offenses. Extortion, on the other hand, covers nearly any other crime where threats are wrongfully used to gain an advantage or to induce someone to do something.

## II.    <u>Extortion</u>

Generally understood, extortion is the "[t]he act or practice of obtaining something or compelling some action by illegal means, as by force or coercion."[17] Like blackmail, the definition of extortion under criminal statutes is more complicated and nuanced than the word's colloquial meaning.

The seminal federal extortion statute is the Hobbs Act.[18] The Hobbs Act forbids extortionate conduct that "in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce" and covers actual extortion, attempts, or conspiracies to do so.[19] "Extortion is defined in the Hobbs Act as 'the obtaining of property from another, with his consent, induced by *wrongful* use of actual or threatened force, violence, or fear, or under color of official right.'"[20] The "property" at issue in a Hobbs Act extortion violation must be "something of value from the victim that can be exercised, transferred, or sold."[21]

Courts have held that "[t]o affect commerce for purposes of the Hobbs Act, it is not necessary that the charged crime be soaked in the stream of commerce."[22] All that is required to be proven by the government for an "affect" is a "realistic probability of a *de minimis* effect on interstate commerce."[23] Proof that the defendant's criminal activity caused or created the likelihood that the individual will deplete the assets of an entity engaged in interstate commerce is sufficient[24] and amounts as little as $1,500 to $5,000 have been found to be sufficient effects on interstate commerce.[25]

Although Hobbs Act extortion is focused mainly on property interests, its scope also covers reputational harm.[26] In what the U.S. Attorney for the Southern District of New York termed an "old fashioned shakedown,"[27] Michael Avenatti threatened Nike with economic and reputational harm by stating that he would hold a press conference on the eve of the company's quarterly earnings call and the start of the annual NCAA men's basketball tournament to announce allegations of misconduct by Nike employees unless the company paid Avenatti's client $1.5 million and agreed to "retain" Avenatti to conduct an "internal investigation" — which Nike never requested — for payment, at a minimum, between $15 and $25 million earned upon receipt.[28] Alternatively, and in lieu of such a retainer agreement, Avenatti demanded a total payment of $22.5 million from Nike to resolve any claims that his client might have and buy Avenatti's silence.[29]

Unlike blackmail, whether the defendant has a right to the property could matter.[30] A recent case in Boston involved two city officials, Kenneth Brissette and Timothy Sullivan, who were charged with Hobbs Act extortion for allegedly forcing a production company to hire union workers as a prerequisite before issuing necessary permits.[31] The defendants moved to dismiss the indictment by arguing that they did not "obtain" any property within the meaning of the Hobbs Act, which went to the union employees.[32] In reversing the district court's dismissal order, the First Circuit held that the "obtaining property" element of Hobbs Act extortion "may be satisfied by evidence showing that the defendants induced the victim's consent to transfer property to third parties the defendants identified, even where the defendants do not incur any personal benefit from the transfer and even where the transfer takes the form of wages paid for real rather than fictitious work."[33] Therefore, the reach of Hobbs Act extortion extends to those that act on behalf of third parties regardless of whether they personally benefited.

The *Brissette* case was tried upon remand, and following a guilty verdict the district court took the extraordinary step of overturning the jury's decision and entering a judgment of acquittal. The court's accompanying opinion emphasized that, with regard to fear of economic harm extortion, "[t]hreats of financial harm are not inherently 'wrongful'" because "fear of such harm is a part of many legitimate business transactions."[34] Several circuits have stated that an economic threat to obtain "property is 'wrongful' under the Hobbs Act only if the defendant has no claim of right to that property and knew as much."[35] This aspect of extortion law could be acutely relevant for practitioners and their clients who are engaged in settlement talks or other high-stakes business negotiations.

Certain interstate communications may also qualify as extortion. Section 875 prohibits the interstate or foreign transmission of threats: (1) to extort money or things of value; (2) to injure the property or reputation of the addressee or of another; (3) the reputation of a deceased person; or (4) any threat to accuse the addressee or any other person of a crime.[36] Section 1030 similarly prohibits the interstate or foreign transmission of threats to: (1) extort money or things of value to cause damage to a protected computer; (2) obtain information from a protected computer without authorization or in excess of authorization; (3) impair the confidentiality of information obtained from a protected computer without authorization or by exceeding authorized access; or (4) demand or request for money or other thing of value in relation to damage to a protected computer, where such damage was caused to facilitate the extortion.[37] This statute was intended to cover "computer-age blackmail" involving any "interstate or international transmissions of threats against computers, computer networks, and their data and programs whether the threat is received by mail, a telephone call, electronic mail, or through a computerized messaging service."[38]

Neither statute defines "extortion," but courts have relied on the Hobbs Act definition of extortion in § 875 prosecutions[39] and model jury instructions track this language for the definition of "intent to extort" in § 1030(a)(7) offenses.[40]

## III.    Travel Act

The Travel Act was passed in 1961 at the behest of Attorney General Robert F. Kennedy to combat the prevalence of organized crime and racketeering syndicates. The House of Representatives report that accompanied the introduction of the Travel Act stated that "[t]he interstate tentacles of this octopus known as 'organized crime' . . . can only be cut by making it a Federal offense to use the facilities of interstate commerce in the carrying on of nefarious activities."[41]

The Travel Act makes it a crime for an individual "to travel in interstate or foreign commerce or use the mail or any facility in interstate or foreign commerce, with the intent to: (1) distribute the proceeds of any unlawful activity; or (2) commit any crime of violence to further any unlawful activity; or (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity" and then perform or attempt to perform that activity.[42]

"Unlawful activity" has several different meanings, including extortion, bribery, or arson in violation of the laws of the State in which it was committed or of the United States.[43] The Travel Act, therefore, allows a state extortion statute to be brought into federal court if any facilities of interstate commerce, like email or SMS, were used even when those laws contain more expansive definitions of the crimes than those found at common law.[44]

## IV.    The Coronavirus Pandemic

The pandemic has exerted unprecedented pressure on everything from supply lines to unemployment lines. Businesses and individuals will continue to operate under these adverse circumstances for the foreseeable future and a spike in pandemic-related crimes is already underway.[45]

Meanwhile, in early April the FBI warned that online extortion and blackmail scams have increased during the Coronavirus Pandemic.[46] Federal criminal trade secret cases likewise continue to rise[47] and while that conduct is separately charged under a different statute,[48] it may also involve extortion where disgruntled employees seek to leverage confidential or proprietary information for additional severance or benefits following dismissal.[49]

This unique environment highlighted by the widespread use of federal monies by private companies and mass layoffs, coupled with the rising volume of information that companies maintain, may result in an increase in blackmail and extortion. For attorneys, threatening criminal action in the context of civil litigation could violate the Model Rules of Professional Conduct and can lead to disciplinary action.[50] For executives and employees, delineating the boundary between hard-nosed business decisions and criminal conduct may make all the difference.

---

The authors are former federal prosecutors Luke Cass and Simon J. Cataldo and are partners at Quarles & Brady LLP and the Ashcroft Law Firm.

[1] https://www.law360.com/articles/1243435/michael-avenatti-found-guilty-of-extorting-nike

[2] https://www.law360.com/articles/1266347/agency-says-atty-used-virus-to-blackmail-toyota-wilmerhale

[3] https://www.law360.com/articles/1231841/ransomware-s-year-end-thank-you-note-to-bitcoin
https://www.fbi.gov/news/pressrel/press-releases/fbi-expects-a-rise-in-scams-involving-cryptocurrency-related-to-the-covid-19-pandemic

[4] United States v. Brissette, 919 F.3d 670 (1st Cir. 2019).

[5] Statutes outside of federal purview may cover a broader range of conduct. For example, in Washington, D.C., the blackmail statute covers (1) criminal accusations; (2) the exposure of a secret or publicizing an asserted fact, whether true or false, tending to subject another person to hatred, contempt, ridicule, embarrassment, or other injury to reputation; (3) impairing the reputation of another person, including a deceased person; (4) distributing a photograph, video, or audio recording, whether authentic or inauthentic, tending to subject another person to hatred, contempt, ridicule, embarrassment, or other injury to reputation; or (5) notifying a federal, state, or local government agency or official of, or publicizing, another person's immigration or citizenship status. D.C. Code § 22-3252.

[6] This is dubbed the "Blackmail Paradox." See United States v. Valenzeno, 123 F.3d 365, 372 n. 3 (6th Cir.1997) (Moore, J., concurring) (noting extensive literature regarding the "paradox in the law of blackmail").

[7] "Whoever, under a threat of informing, or as a consideration for not informing, against any violation of any law of the United States, demands or receives any money or other valuable thing, shall be fined under this title or imprisoned not more than one year, or both."

[8] United States v. Totoro, No. CR 15-291, 2017 WL 3189216, at *11 (E.D. Pa. July 27, 2017).

[9] United States v. Coyle, 63 F.3d 1239, 1250 (3d Cir. 1995).

[10] Id.

[11] 18 U.S.C. § 873.

[12] No. 09-CR-824 DC, 2012 WL 1319805, at *1 (S.D.N.Y. Apr. 13, 2012), case abated, 541 F. App'x 124 (2d Cir. 2013).

[13] Id.

[14] Id.

[15] Id.

[16] Id.

[17] Jordan v. Aramark, No. 1:06-CV-192-R, 2007 WL 1175050, at *2 (W.D. Ky. Apr. 20, 2007) (quoting Black's Law Dictionary, 266 (2d. Pocket ed. 2001)).

[18] 18 U.S.C. § 1951(a).

[19] Id.

[20] United States v. Villalobos, 748 F.3d 953, 955 (9th Cir. 2014) (citing 18 U.S.C. § 1951(b)(2)) (emphasis supplied).

[21] United States v. Silver, 864 F.3d 102, 114 (2d Cir. 2017) (quoting Sekhar v. United States, 133 S.Ct. 2720, 2724, (2013)).

[22] United States v. Tkhilaishvili, 926 F.3d 1, 11 (1st Cir. 2019).

[23] United States v. Capozzi, 486 F.3d 711, 725-26 (1st Cir. 2007).

[24] United States v. Collins, 40 F.3d 95, 100 (5th Cir. 1994); see also United States v. Devin, 918 F.2d 280, 293 (1st Cir. 1990) (finding de minimis standard satisfied where individual was president and proprietor of business operating in interstate commerce).

[25] United States v. Rivera Rangel, 396 F.3d 476, 483 (1st Cir. 2005) (holding that evidence of $1,500 to $5,000 payments "alone was sufficient to establish extortion induced by fear of economic loss.").

[26] United States v. Brank, 724 F. App'x 527, 529 (9th Cir.), cert. denied, 139 S. Ct. 232 (2018); see also United States v. Nardello, 393 U.S. 286, 296 (1969) (holding that extortion encompassed threats to injure a victim's reputation); Cf. United States v. Koziol, No. 2:18-CR-00022-CAS, 2019 WL 2109639, at *2 (C.D. Cal. May 13, 2019) (observing that whether Hobbs Act extortion covers threats to reputation may raise a "fairly debatable" question.)

[27] https://www.justice.gov/usao-sdny/pr/statement-us-attorney-geoffrey-s-berman-verdict-trial-michael-avenatti

[28] https://www.justice.gov/usao-sdny/pr/us-attorney-announces-arrest-michael-avenatti-engaging-scheme-extort-public-company

[29] Id.

[30] United States v. Sturm, 870 F.2d 769, 773 (1st Cir. 1989) ("We therefore hold that for purposes of the Hobbs Act, the use of legitimate economic threats to obtain property is wrongful only if the defendant has no claim of right to that property.").

[31] *Brissette*, 919 F.3d at 672.

[32] Id.

[33] Id. at 685–86.

[34] United States v. Brissette, No. 16-cr-10137-LTS, 2020 WL 718294, at *20 n.43 (D. Mass. Feb. 12, 2020) (quoting United States v. Burhoe, 871 F.3d 1, 9 (1st Cir. 2017)); see also Brokerage Concepts, Inc. v. U.S. Healthcare, Inc., 140 F.3d 494, 503, 509 (3d Cir. 1998); United States v. Kattar, 840 F.2d 118, 123 (1st Cir. 1988).

[35] *Burhoe*, 871 F.3d at 9 (internal quotation marks omitted); Brokerage Concepts, Inc., 140 F.3d at 523; United States v. Capo, 791 F.2d 1054, 1062 (2d Cir. 1986) (stating that the Hobbs Act only reaches the use of economic fear "in order to obtain property to which the exploiter is not entitled").

[36] 18 U.S.C. § 875(b),(d).

[37] 18 U.S.C. § 1030(a)(7)(A)-(C).

[38] S. Rep. No. 104-357, at 12, 1996 WL 492169, at *29 (1996).

[39] United States v. Cohen, 738 F.2d 287, 289 (8th Cir. 1984) (in case charged under 18 U.S.C. § 875(d), court borrowed the definition of "extortion" found in the Hobbs Act, defining "intent to extort" as meaning "an intent to get the property of another with his consent, induced by wrongful use of actual or threatened force, violence or fear").

[40] Model Crim. Jury Instr. 8th Cir. 6.18.1030I (2020).

[41] H.R. Rep. No. 87–966 (1961).

[42] 18 U.S.C. § 1952(a)(3).

[43] 18 U.S.C. § 1952(b); United States v. Culbert, 435 U.S. 371, 378 (1978) ("As Representative Hobbs noted, the words robbery and extortion "have been construed a thousand times by the courts. Everybody knows what they mean.") (citing 91 Cong. Rec. 11912 (1945)).

[44] United States v. Manzo, 851 F. Supp. 2d 797, 804 (D.N.J. 2012).

[45] https://www.justice.gov/ag/page/file/1258676/download

[46] http://image.communications.cyber.nj.gov/lib/fe3e15707564047c7c1270/m/2/FBI+PSA+-+4.20.2020.pdf

[47] https://www.justice.gov/opa/pr/former-ge-engineer-and-chinese-businessman-charged-economic-espionage-and-theft-ge-s-trade

[48] 18 U.S.C. § 1832 (criminalizing the theft of trade secrets).

[49] https://www.fbi.gov/contact-us/field-offices/seattle/news/press-releases/kentucky-man-convicted-of-theft-of-trade-secrets-sentenced-in-yakima-federal-court

[50] ABA Formal Op. 92-363; see also ABA Model Rules 4.1, 4.4.

© The National Law Forum. LLC

12/31/21, 2:08 AM                                Federal Blackmail Extortion Statutes Nefarious Negotiations

National Law Review, Volume X, Number 132
Source URL: https://www.natlawreview.com/article/federal-blackmail-extortion-statutes-nefarious-negotiations

Exhibit B

*The Law Office of Christopher T. Beres*
*1600 Sarno Road, No. 1*
*Melbourne, FL 32935*
*Tel. (321) 339-9301*
*christopherberes8@gmail.com*

*April 07, 2020*

██████████

*Toyota Motor Corporation*
*1 Toyota-Cho*
*Toyota City*
*Aichi Prefecture 471-8571*
*Japan*
████████*@toyota.co.jp*

*Dear Mr.*████████████████████*:*

*I represent Andrew Delaney against Toyota.*

*You used Mr. Delaney to be a* ████ *language document reviewer to assist you with* ████████
████████████████████████████████ *starting on September 30, 2019.*

*On March 17, 2020, you had Mr. Delaney illegally fired for raising concerns about unlawful and unsafe conditions in your workplace.*

*Prior to this date, you illegally disclosed Mr. Delaney's identity, involvement, and work-product to the other side.*

*At first, you did not inform him about the subject matter of the case which was* ████████████
████████████████████████████

*Toyota insisted on* ████████████████████████████
████████████████

HC2-05000511

*For Toyota,* ███████████████████████████████████ *but you had no right to drag Mr. Delaney into this.*

███████████████████████████████████████ *You have destroyed Mr. Delaney's residence and business and placed his life in grave danger.*

*After Mr. Delaney was a whistleblower and complained about* ███████████ *, you defamed him, made up lies about him, and threatened him.*

*I hereby grant you 7 days from the date of this letter to contact me with your offer to settle this case.*

*If you fail to contact me by this date, I will commence legal action against you without further notice.*

*Very truly yours,*

*Christopher T. Beres*

Christopher T. Beres

HC2-05000512

Exhibit C



**Portfolio Media. Inc.** | 111 West 19th Street, 5th floor | New York, NY 10011 | www.law360.com
Phone: +1 646 783 7100 | Fax: +1 646 783 7161 | customerservice@law360.com

# DOJ Takes Toyota Thai Bribery Probe To Texas Grand Jury

By **Frank G. Runyeon**

Law360 (May 26, 2021, 7:35 PM EDT) -- U.S. authorities are ramping up their Foreign Corrupt Practices Act investigation of Toyota, with federal prosecutors impaneling a grand jury in Texas as they seek any evidence the carmaker bribed top Thai judges to overturn a $350 million tax judgment, according to a U.S. law enforcement official and documents related to the investigation.



Federal prosecutors have impaneled a grand jury in Texas as they investigate Toyota for potential Foreign Corrupt Practices Act violations, according to a law enforcement official and documents. (AP Photo/David Zalubowski)

According to the law enforcement documents, the ongoing investigations by the U.S. Department of Justice and U.S. Securities and Exchange Commission, which Toyota disclosed in a public filing earlier this year, appear to be premised on the findings of an internal company investigation conducted by WilmerHale. The findings were presented by Debevoise & Plimpton LLP to U.S. authorities in April 2020.

In particular, Toyota suspected senior attorneys for Toyota Motor Thailand, or TMT, may have funneled bribes through a private Thai law firm to Thailand Supreme Court judges in an effort to influence the decision on a still-pending appeal of the tax judgment, according to sources familiar with the matter and documents describing the company's inquiry.

The grand jury was impaneled as part of the investigation in the Northern District of Texas, which encompasses Dallas, near Toyota's U.S. headquarters, according to the U.S. source. While the proceedings are secret, former DOJ attorneys not involved in the case told Law360 that prosecutors typically use grand juries at this stage of FCPA cases to subpoena bank records and other documents as they investigate possible bribery of foreign officials.

The DOJ and SEC declined to comment.

Debevoise and WilmerHale did not respond to a request for comment on Monday.

"Toyota works tirelessly to uphold the highest professional and ethical standards in each country where we operate. We take any allegations of wrongdoing seriously and are committed to ensuring that our business practices comply with all appropriate government regulations," a Toyota spokesperson said. "We are not in a position to share any further comment."

In March, Toyota said it was **cooperating with the U.S. investigations**.

The internal Toyota investigation found that TMT contracted with Annanon Law Office to help establish a backchannel to Thailand's highest ranking judge via a former chief judge and an advisor, law enforcement documents show. TMT paid nearly $18 million on the $27 million contract, according to the documents, with $9 million to be paid if Toyota won the appeal, which relates to import taxes on Prius car parts.

Federal investigators are reportedly now seeking to determine if TMT, either directly or through the Annanon law firm, paid former Supreme Court of Thailand President Direk Ingkaninan and Supreme Court senior advisor Chaiyasit Trachutham to persuade high court president Slaikate Wattanapan to accept Toyota's argument and have the court rule in its favor within a year, sometime after Slaikate's term began in October 2019, according to the U.S. official and documents related to the investigation.

Thai government records indicate that around the time of the alleged bribery scheme Direk was a sitting senior judge and Slaikate was president of the Supreme Court. While the duration of Chaiyasit's alleged tenure as a high court advisor is unclear, records show he was a senior judge on the Court of Appeal for Specialized Cases until at least October 2019.

Annanon was first paid in May 2015 to help with the trial court, or Primary Court, case, according to **a Toyota document outlining the protocol** for the company's internal investigation at its outset. The document, which was obtained by Law360 and independently verified, also said that "Mr. Direk assisted TMT with the Prius case in the Primary Court and has been involved again in the current possible Supreme Court appeal."

Direk, 70, was the top ranking senior judge on the Supreme Court as of May 2020, government records show, and is eligible to serve until he ages out next September. Records show Chaiyasit, 70, reached mandatory retirement age in September 2020 after various judicial posts on Thailand's appellate and supreme courts. Slaikate, 66, stepped down as Supreme Court president in September 2020, but retained senior judge status.

Annanon Law Office referred questions from Law360 to Toyota.

Direk and Slaikate did not respond to emails from Law360, but a court official on Tuesday said the two senior judges received the messages and declined to comment. Chaiyasit did not respond to emails requesting comment.

The long-serving Toyota attorneys who law enforcement documents claim allegedly organized the scheme — General Manager Wichien Hirunmahapol, his deputy Sathit Tungjitpreechatai and Pornchai Saetachantana — left TMT in the midst of Toyota's internal corruption probe and opened a boutique law firm, according to online biographies, the firm's website and sources familiar with that investigation.

Wichien, Sathit, and Pornchai did not respond to multiple emailed requests for comment in English and Thai. Wichien answered his phone, said he did not understand and hung up. Pornchai picked up his phone, said he was at work and hung up. Neither answered follow-up calls. Sathit could not be reached by phone.

A court official confirmed on Monday that Direk and Slaikate remain sitting senior judges on Thailand's Supreme Court but did not immediately confirm Chaiyasit's employment status. He referred Law360 back to an earlier public statement.

Responding to Law360's previous reporting on the Toyota internal investigation, a spokesperson for Thailand's courts issued a two-page statement on April 3 saying that if evidence of judicial bribery is put forward, the judiciary committee "will proceed to investigate and decisively punish such acts that bring disgrace to the honor of the judge, destroy the court's neutrality, and make the society distrust the Thai justice system."

Court of Justice spokesperson Suriyan Hongvilai confirmed at the time that Toyota had appealed the

Thai Customs Department tax judgment to the high court. Thailand's Supreme Court has not announced a decision yet.

---

All Content © 2003-2022, Portfolio Media, Inc.

Exhibit D

Sign Up

Email or phone

Password

Log In

Forgot account?

**The National Law Review**
May 12, 2020 · 

Federal Blackmail & Extortion Statutes: Nefarious Negotiations - Authored by Luke Cass (Quarles & Brady Law Firm) Simon Cataldo (the Ashcroft Law Firm)



NATLAWREVIEW.COM
**Federal Blackmail & Extortion Statutes: Nefarious Negotiations**
Legal issues involving blackmail and extortion are on the rise.  From the…

1 Comment

Share

### Related Pages

 **Contemptor**
Media/News Company

 **CopperState BBQ & Grub**
Barbecue Restaurant

 **University of Colorado Law School**
Campus Building

 **City University of New York Law …**
College & university

 **Alliancestl**
Business & Economy Website

 **Island Pearl Excursions**
Boat Service

 **Pure Recovery California Inc**
Addiction Resources Center

 **Robus - Consulting and Legal M…**
Business Consultant

 **Washington Law Review**
Lawyer & Law Firm

 **Law.com**
Media/News Company

 **EMS World - Emergency Medical…**
Education

 **Chop Happy**
Kitchen/cooking

### Pages Liked by This Page

 **Jennings, Strouss & Salmon, PLC**

**See more of The National Law Review on Facebook**

Log In     or     Create new account

Recent Post by Page

**The National Law Review**
Yesterday at 3:10 PM

Content Marketing Idea: Create a Year-End Email and Social Media Post
http://dlvr.it/SGL7Fy

| 1 | 1 Comment |
|---|---|

Share

**The National Law Review**
Yesterday at 10:42 AM

#AdministrativeampRegulatory #LaborampEmployment NLRB Considers Aban... See more

Share

**The National Law Review**
Yesterday at 10:21 AM

#CommunicationsMediaampIntemet #ElectionLawLegislativeNews 2021 Year in Review: CCPA Litigation

Share

English (US) · Español ·
Português (Brasil) · Français (France) ·
Deutsch

Privacy · Terms · Advertising · Ad Choices
Cookies · More
Meta © 2022

See more of The National Law Review on Facebook

| Log In | or | Create new account |
|--------|----|--------------------|